Alfred U. McKENZIE, et al., Plaintiffs,

v.

Ralph E. KENNICKELL, Jr.,
Defendant.

Civ. A. No. 73–0974.

United States District Court,
District of Columbia.

Sept. 12, 1986.

See also, D.C., 645 F.Supp. 427.

Douglas L. Parker, Institute for Public Representation, William A. Bradford, Jr., Elliot M. Minceberg, Craig A. Hoover, Hogan & Hartson, Roderic V.C. Boggs, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

In 1973, plaintiffs filed this case against the United States Government Printing Office ("GPO"), alleging racial discrimination against blacks in hiring and promotion practices, a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Protracted and hotly contested litigation ensued which, unfortunately, has still not concluded. Plaintiffs have now filed a motion for an interim award of attorneys' fees under 42 U.S.C. § 2000e-5(k). The Court believes that such an award is justified and grants plaintiffs' motion as explained below.

## BACKGROUND

When this case was filed, the Civil Rights Act Amendments of 1972, which made Title VII applicable to federal government employees, were barely a year old. In the early stages of this proceeding, therefore, plaintiffs' counsel were exploring an uncertain legal landscape. During the course of the litigation, the Supreme Court and our Circuit Court regularly handed down landmark decisions on Title VII issues,[1] both procedural and substantive, requiring counsel to constantly reassess and sometimes reshape their arguments. Their task was made no easier by the government, which fought plaintiffs' claim with every weapon at its disposal and consistently refused to acknowledge that the GPO had violated any Title VII rights of black workers.

In 1975, after the initial stages of this case which included class certification proceedings, substantial discovery, and a remand for further administrative proceedings, the parties filed cross-motions for summary judgment. In January 1977, the Court issued a Memorandum Opinion and Order, finding that plaintiffs had established GPO's liability. *McKenzie v. McCor-*

*mick,* 425 F.Supp. 137 (D.D.C.1977). Over the next four years, extensive and complicated proceedings developed concerning plaintiffs' application for appropriate final relief. Plaintiffs twice obtained preliminary injunctions to prevent proposed GPO employment decisions that threatened the Court's ability to order effective relief. Further discovery and the use of court appointed experts were necessary. On January 30, 1981, the Court issued a comprehensive order granting plaintiffs broad injunctive relief and the possibility of monetary relief for individual class members. *McKenzie v. Saylor,* 508 F.Supp. 641 (D.D.C.1981). Plaintiffs were declared the prevailing party for purposes of attorneys' fees and costs.

In *McKenzie v. Sawyer,* 684 F.2d 62 (D.C.Cir.1982), the Court of Appeals affirmed the 1977 liability ruling in substantial part, holding that summary judgment for the plaintiffs was proper except with respect to their allegations of discriminatory selection of journeymen after 1971. The case was remanded for further proceedings on that issue. The January 1981 relief order was upheld in full, except that specific timetables for the promotion of black employees were vacated. Since the Court of Appeals decision, there have been further proceedings concerning the exact procedures for adjudicating individual back pay claims and specific disputes over the defendant's compliance with the relief order.

Plaintiffs originally filed a petition requesting attorneys' fees and costs in April 1981. The present motion for an interim award, filed in August 1985, covers the same period that is the subject of the original petition—from the outset of the case until January 30, 1981, the date of the final relief order. In a supplemental motion filed in November 1985, plaintiffs revised and updated their request in light of intervening case law and objections raised by

---

1. *E.g., Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *United Air Lines, Inc. v. Evans,* 431 F.2d 533 (1977); *International Brotherhood of* *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Hackley v. Roudebush,* 520 F.2d 108 (D.C.Cir.1975).

the government in its opposition to the motion for an interim award.

The government does not dispute that plaintiffs are entitled to recover attorneys' fees as the prevailing party in this litigation or that an interim award of some kind is permissible. When a party has succeeded in obtaining substantial interlocutory relief, an interim award of fees may be made. *See Bradley v. School Board of City of Richmond*, 416 U.S. 696, 723, 94 S.Ct. 2006, 2022, 40 L.Ed.2d 476 (1974); *Grubbs v. Butz*, 548 F.2d 973, 976–77 (D.C.Cir.1976). Defendant objects, however, to the amount of the interim award proposed by the plaintiffs.

## DISCUSSION

### I. The Lodestar

■ It is well established in this Circuit that the first step in determining the appropriate amount of attorneys' fees in a particular case is the calculation of a "lodestar" figure. This is done by multiplying the reasonable hourly rates for the attorneys to whom fees are to be awarded by the number of hours reasonably devoted to the litigation by each attorney. *See Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir.1984, *cert. denied*, — U.S. —, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985); *National Association of Concerned Veterans v. Secretary of Defense ("NACV")*, 675 F.2d 1319 (D.C.Cir.1982); *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (*en banc*). While the lodestar methodology was first developed in cases where fees were to be awarded from monetary settlements or verdicts in class actions, the Supreme Court has implicitly approved the practice in statutory fee cases such as *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). *See Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237, 241–46 (1985).

■ Part of the advantage of the lodestar method is that it gives an air of objec-

tivity to the determination and thus should forestall a "second major litigation," *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941, on the question of fees. Without question, prolonged, petty disputes over fees are wasteful of the courts' resources and have a damaging impact on the morale, not to mention the reputation, of the legal profession as a whole. *See id.* at 442, 103 S.Ct. at 1944 (Brennan, J., concurring in part and dissenting in part) (characterizing appeals from fee awards as "one of the least socially productive types of litigation imaginable"). Despite the warnings of our Circuit Court against nit-picking disagreements, intransigence, and unreasonable negotiating positions, *e.g., Commonwealth of Puerto Rico v. Heckler*, 745 F.2d 709, 714 (D.C.Cir.1984); *NACV*, 675 F.2d at 1338 (Tamm, J., concurring), the government has fought attorneys' fees petitions "tooth and nail." This proceeding is no exception. In reviewing this petition, the Court has endeavored to fairly and equitably assess all reasonable challenges to plaintiffs' claims, but has resisted and will continue to resist the government's invitation to undertake a line by line examination of the fee request and "pleading by pleading examination of the copious files in this case." *Copeland*, 641 F.2d at 903. The parties are advised that, unless directed to the contrary by appellate authority, the Court will employ a similar approach in evaluating subsequent petitions in this case, including requests for fees for the numerous pleadings filed relating to this interim petition.

### A. Reasonable Hourly Rates

#### 1. Compensation for Delay

Much of the briefing on this interim fee petition concerned an issue which was, to a great extent, recently resolved by the Supreme Court. Plaintiffs consistently maintained that the government would not be prejudiced by the award of the full amount requested in their interim petition, based on historical rates, because a final award would undoubtedly include a multiplier or use current hourly rates in order to com-

pensate for the long delay in payment.[2] This argument was fully consistent with the law in this Circuit, particularly the decision in *Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C.Cir.1984); *see also Laffey,* 746 F.2d at 20 n. 104; *Copeland,* 641 F.2d at 893 n. 23.

However, on July 1, 1986, in *Library of Congress v. Shaw,* —— U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), the Supreme Court held that in enacting the attorneys' fees provision of Title VII, Congress did not waive the federal government's traditional immunity from interest awards. Thus it disallowed an award of attorneys' fees that included a 30 percent multiplier to compensate for a delay in payment. An introductory section of the opinion noted that Judge Ginsburg, dissenting from our Court of Appeals' opinion approving the multiplier, felt that the use of current rates to compensate for delay, as approved in *Murray v. Weinberger,* would not violate the no-interest rule. 106 S.Ct. at 2961. The Court later held that whether the multiplier applied by the district court was characterized as interest or compensation for delay was irrelevant:

> Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money.... Thus, whether the loss to be compensated by an increase in a fee award stems from an opportunity cost or from the effects of inflation, the increase is prohibited by the no-interest rule.

*Id.* at 2965 (citations and footnote omitted).

This language strongly suggests that the use of current rates would also run afoul of the no-interest rule. On the other hand, it might be argued that in this section of its

opinion, the Supreme Court was addressing the multiplier used in this case before it, not the alternative approach favored by Judge Ginsburg. The use of current rates in the calculation of the lodestar was not specifically disapproved and in part responds to concerns to which a multiplier does not.[3]

■ This proceeding is a prime example of the inequity of prohibiting any method of computing fees that compensates for delay. Thirteen years after the filing of the complaint, plaintiffs' counsel have yet to receive any compensation for their services. A final award may still be years away. And despite the Supreme Court's expressed distaste for making attorneys' fees proceedings a "second major litigation," *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941, the government now has little financial incentive to expeditiously resolve attorneys' fees claims. Prolonged litigation may become the rule rather than the unfortunate exception. Nonetheless, pending further guidance from appellate authority, the Court will award fees based on historical rates only.[4]

### 2. Rates Allowed in This Proceeding

■ Having decided to use historical rates in the calculation of the lodestar, the Court now considers the rates charged by the individual attorneys involved in this case. A "reasonable hourly rate is that prevailing in the community for similar work." *Copeland,* 641 F.2d at 892; *accord Blum v. Stenson,* 465 U.S. at 895–96 & n. 11, 104 S.Ct. at 1547 n. 11. The starting and usually the ending point in this analysis if an attorney is involved in private

---

**2.** Plaintiffs also asserted that the final award will be substantially more than the amount requested as an interim fee because it will include fees for the period from 1981 to the present, which included proceedings in the Court of Appeals and substantial work before this Court relating to the implementation of the final relief order.

**3.** For example, long running cases handled by firms or attorneys that do not bill their clients will present courts with extremely complex problems to determine prevailing market rates

over a period of many years. Using current rates greatly simplifies this task. *See Murray v. Weinberger,* 741 F.2d at 1433.

**4.** After the Supreme Court remanded the case for reconsideration in light of *Shaw,* our Court of Appeals recently vacated a fee award based on current rates. Palmer v. Schultz, 798 F.2d 508 (D.C.Cir.1986) (per curiam), *remanded by Schultz v. Palmer,* —— U.S. ——, 106 S.Ct. 3324–25, 92 L.Ed.2d 731 (1986).

practice is the hourly rate charged for services by the attorney or his firm. *See Laffey*, 746 F.2d 4 at 16–17. To encourage settlement and avoid turning every petition into a complicated ratemaking proceeding, this Circuit has held that *"[i]n almost every case, the firms' established billing rates will provide fair compensation."* *Id.* at 24 (emphasis in original).

■■■ Where a lawyer or firm has no established rate, a court must determine the prevailing market rate. "[R]ates charged in private representations may afford relevant comparisons." *Blum v. Stenson*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. The burden is on the applicant to establish that the requested rate is the prevailing community rate, through affidavits and references to fee awards in similar cases. Once such a showing has been made, the government bears the burden to go forward with evidence that the rate is erroneous. *See NACV*, 675 F.2d at 1325–26.

Plaintiffs' attorneys fall into three categories. The bulk of the legal services in the early years of this proceeding were performed by lawyers from the law firm of Hogan & Hartson through its Community Services department. Significant assistance was also provided by attorneys from two public interest organizations—Washington Lawyers Committee for Civil Rights Under Law and, beginning in 1977, Institute for Public Representation. Plaintiffs base their fee petition for all attorneys on the rates charged by Hogan & Hartson

attorneys from 1973–1980, based on a detailed affidavit from a partner in that firm.[5]

■■■ For the attorneys actually employed by Hogan & Hartson, the rates claimed are presumptively reasonable. Nevertheless, the government insists that "the rates charged by Hogan & Hartson attorneys in the course of the firm's general practice has [sic] no necessary relevance to the appropriate fees to be charged in this case."[6] It argues that because the work was performed by the firm's Community Services department which handles *pro bono* cases, plaintiffs must show in addition that the firm's rates are what prevails in the community for Title VII work. Judge Wilkey succinctly answered this argument in *Laffey*: "[W]hen fixed market rates already exist, there is no good reason to tolerate the costs of turning every attorneys fee case into a major ratemaking proceeding.... The established rates represent the opportunity cost of what the firm turned away in order to take the litigation." *Laffey*, 746 F.2d at 24. This is true no matter what department of the firm handled the case.

■■■ While there is no similar presumption that Hogan & Hartson's rates are reasonable for the public interest attorneys, a number of factors support a conclusion that they are appropriately used in this proceeding. First, plaintiffs have called the Court's attention to attorneys' fees awards in similar or comparable cases.[7] These cases show that the requested rates are well within the range of what other courts have found to be reasonable.[8] Next,

5. Declaration of William A. Bradford, Jr. ("Bradford Declaration"), Plaintiffs' Supplemental Motion for Interim Award of Costs and Attorneys' Fees, Nov. 15, 1986, Exhibit A.

6. Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Award of Interim Award of Costs and Attorneys Fees, Oct. 18, 1985, at 7.

7. *See* Plaintiffs' Application for Costs and Attorneys' Fees, Apr. 20, 1981, at 19–20; Plaintiffs' Supplemental Motion for Interim Award of Costs and Attorneys' Fees, Nov. 15, 1985, Exhibit G.

8. The Supreme Court in Blum v. Stenson upheld rates of $100 and $105 per hour to Paula Galowitz and Arthur Fried, Legal Aid attorneys in New York with 2½ and 3½ years of experience respectively, for work done in 1978 and 1979 on a Medicaid class action. 465 U.S. at 890–91 n. 4, 104 S.Ct. at 1544 n. 4. Plaintiffs request the rate of $40/hour in 1978 for Alan Schwartz, an attorney who, like Galowitz, graduated from law school in 1976 and served as a judicial law clerk for one year thereafter. They request the rate of $60/hour in 1978 and $80/hour in 1979 for Dale Swartz, an attorney who graduated from law school in the same year as Fried. The two public interest lawyers who request rates for 1978 greater than those approved in *Blum* are

the two public interests lawyers who devoted the most time to the case, Douglas Parker and Dale Swartz, actually began their work on this litigation while employed by Hogan & Hartson. They thus brought experience and knowledge of the case with them that most likely significantly decreased the ultimate expenditure of hours. Therefore, even if the rates charged by Hogan & Hartson were at the high end of the market rate for Title VII work, these lawyers' services merit that rate.

Finally, and perhaps most significantly, the government has never argued, much less attempted to show, that the rates claimed for the public interest attorneys are excessive. As the court stated in *NACV,*

> Although there may be occasions in which the applicant's showing is so weak that the Government may without more simply challenge the rate as unsubstantiated, in the normal case the Government must either accede to the applicant's requests rate or provide specific contrary evidence tending to show that a lower rate would be appropriate.

675 F.2d at 1326. Two years after the decision in *Laffey* and four years after the decision in *NACV,* the government certainly possesses the background factual information necessary to mount a specific challenge to the reasonableness of the rates requested here if such a challenge has any merit whatsoever. *See id.* at 1327. Plaintiffs' submission is simply not so weak that it can be challenged solely for being unsubstantiated.

Accordingly, for purposes of the lodestar calculation, the hourly rates requested by plaintiffs will be used. Some minor adjust-

ments, noted below, have been made to resolve inconsistencies in plaintiffs' submission. The Court finds that these rates are properly used to compensate for the services plaintiffs' attorneys provided during the period presently under consideration, 1973–1980.

| Attorney | Year | Rate |
| --- | --- | --- |
| **Hogan & Hartson** | | |
| Ferren | 1973 | $70.00 |
| | 1974 | 85.00 |
| Tatel | 1974 | 75.00 |
| | 1975 | 75.00 |
| | 1977 | 95.00 |
| D. Parker | 1973 | 40.00 |
| | 1974 | 45.00 |
| | 1975 | 60.00 |
| Polmer | 1973 | 35.00 |
| | 1974 | 40.00 |
| | 1975[9] | 55.00 |
| | 1976 | 60.00 |
| Swartz | 1977 | 45.00 |
| | 1978 | 50.00 |
| Wolk | 1977 | 50.00 |
| Minceberg | 1977 | 40.00 |
| | 1978 | 40.00 |
| | 1979 | 60.00 |
| | 1980 | 75.00 |
| Raven-Hansen | 1978 | 65.00 |
| | 1979 | 80.00 |
| | 1980 | 90.00 |
| McClearyCale | 1978 | 40.00 |
| Keeney | 1979 | 65.00 |
| Moody | 1980 | 60.00 |
| Wolff | 1980 | 65.00 |
| Stone (law clerk) | 1977 | 25.00 |
| Moore (paralegal) | 1976 | 25.00 |
| | 1977 | 30.00 |

| Washington Lawyers' Committee for Civil Rights Under Law | | |
| --- | --- | --- |
| Boggs | 1973 | 65.00 |
| | 1974 | 75.00 |
| | 1975 | 80.00 |
| | 1977 | 105.00 |
| | 1978 | 120.00 |
| Swartz | 1978 | 50.00[10] |
| | 1979 | 80.00 |
| | 1980 | 90.00 |

Roderic V.C. Boggs, a well known civil rights lawyer who at that time had practiced law for 12 years and Douglas Parker who had six years of legal experience.

9. Plaintiffs' petition requests two different rates for Henry Polmer in 1975. Although the Court can surmise that this indicates his hourly rate increased at some point during the year, no explanation for the change is given, nor is the date indicated after which time was charged at the higher rate. Therefore, the single lower rate

is used for all hours during that year. The same is true for the work in 1977 for Dale Swartz and in 1979 by Peter Raven-Hansen.

10. Plaintiffs request $60 per hour for work done by Mr. Swartz during 1978 after he moved to the Washington Lawyers' Committee. They offer no explanation for the difference between this rate and the $50 per hour charged by Hogan & Hartson for Mr. Swartz's time at the beginning of the same year. This discrepancy will be resolved in favor of the government.

Institute for Public Representation

| D. Parker | 1977 | 105.00 |
|-----------|------|--------|
| | 1978 | 115.00 |
| | 1979 | 130.00 |
| | 1980 | 140.00 |
| Schwartz | 1978 | 40.00 |
| Tanaka | 1980 | 60.00 |

## B. Reasonable Hours

■ A determination of the number of hours reasonably expended on the litigation is the next step of the lodestar calculation. The hours reasonably expended are not necessarily equal to the hours actually expended. *Copeland*, 641 F.2d at 891.

■ Compensation is not permitted for "excessive, redundant, or otherwise unnecessary" expenditures of time, and counsel are expected to exercise billing judgment to exclude such time from their fee petitions. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939. If such judgment is exercised, "the nature of the work and the number of hours [excluded] should be stated." *NACV*, 675 F.2d at 1327–28. Prevailing plaintiffs must present an application sufficiently detailed to allow the courts to determine whether the hours claimed are justified. *Id.* at 1327.

■ Fees also cannot be recovered for work on unsuccessful claims. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Plaintiffs in their petition, or the courts upon review, should exclude time spent on "truly fractionable" claims or issues on which they did not prevail. *See NACV*, 675 F.2d at 1327 n. 13; *Copeland*, 641 F.2d at 892 n. 18. It is not necessary or proper, however, to exclude time simply because a party did not prevail on every argument made or claim raised. If the time expended cannot be divided into work on discrete claims because those claims involved a common core of facts or related legal theories, the court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. The question is whether the plaintiff achieved "a level of success that makes the hours reasonably expended a satisfactory basis for making a

fee award." *Id.* at 434, 103 S.Ct. at 1940. With these principles in mind, the Court now turns to a consideration of the hours claimed by plaintiffs' counsel.

### 1. Unsuccessful Claims

The government argues that plaintiffs' award must be substantially reduced because a portion of this Court's ruling on the liability of the GPO was not sustained on appeal. It contends that plaintiffs are not the prevailing party to that extent and, under *Hensley*, their counsel cannot be compensated for services rendered in pursuit of those claims. In a related argument, the government also states that plaintiffs' petition does not comply with the dictates of *NACV* because it does not identify specific expenditures of time with specific claims.

■ The Court is not convinced by the government's arguments. They do not justify a reduction in fees under the circumstances of this case. Plaintiffs alleged in their complaint a pattern and practice of race discrimination against blacks in hiring throughout the Offset Print Section ("OPS") of the GPO. Throughout the period of the litigation covered by the present fee application, the Court and the parties treated the case as one broad Title VII claim. None of the parties' pleadings suggested that plaintiffs were pursuing "fractionable claims" before this Court.

Our Court of Appeals reviewed the 1977 liability ruling under the exacting standards applicable to summary judgment proceedings. Plaintiffs were required to have "raise[d] the inference [that OPS engaged in] discrimination and foreclose[d] the possibility that the employment picture in OPS was anything other than the result of discrimination." *McKenzie v. Sawyer*, 684 F.2d at 72. The Court then turned to the plaintiffs' evidence and stated:

In analyzing the plaintiffs case, it will be useful to divide it into three parts: the plaintiffs' showing on promotions to up-rate and supervisory positions, the positions beyond the journeyman level; the plaintiffs; showing on promotions to

journeyman *before* 1972; and the plaintiffs' showing on promotions to journeyman in 1972 and 1973. With respect to the first two portions, the plaintiffs' case was indeed overwhelming, but with respect to the third, we find that it was insufficient to support a grant of summary judgment for the plaintiffs.

*Id.* at 72–73. The Court of Appeals found that plaintiffs had inadequate statistical evidence of discrimination with respect to the third part of the case and that other evidence was disputed. *Id.* at 74. It therefore vacated aspects of the relief order that were predicated on a finding of liability after 1971 with respect to hiring of journeyman. *Id.* at 78. In addition, it found that specific timetables for minority hiring were unnecessary in view of the "sweeping changes in promotion practices and the hiring goals" that this Court had ordered. *Id.* at 80.

The 1982 appellate decision was the first time that the discrimination claim was described as having three parts. Indeed, the complaint was summarized as alleging "that GPO engaged in pervasive failures to hire, train, and promote black employees at all levels within OPS." *Id.* at 66. It is simply not possible to consider the "third part" of the case a "fractionable" claim or issue, nor is it reasonable to expect that counsel's time records would or could separately reflect work on that part of the case. Moreover, a large amount of the research and briefing in the case was relevant to the overall claim of disparate treatment of blacks by GPO. The same can be said of the work involved in preparing the timetables that were vacated.

■ Since it is impossible to separate or carve out time spent on the portion of the liability and relief proceedings that was vacated on appeal, the question is whether the overall relief obtained by the plaintiffs justified the hours expended by counsel. Having presided over this extended litigation since 1973, the Court has no doubt that the overall outcome of this case is commensurate with the efforts of counsel. As the Supreme Court observed in *Hensley:*

Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.... The result is what matters.

461 U.S. at 435, 103 S.Ct. at 1940. While it is still too early to determine if enhancements are appropriate in this case, the Court has little trouble concluding that all hours reasonably expended should be compensated by this fee award, even though plaintiffs did not ultimately succeed on every contention raised. "[T]he most critical factor is the degree of success obtained." *Id.* at 436, 103 S.Ct. at 1941. Plaintiffs in this case were successful in bringing to an end longstanding, invidious race discrimination by a government agency employing large numbers of blacks. The result achieved by their counsel warrants full compensation.

### 2. Hours Reasonably Expended in This Proceeding

■ Plaintiffs' November 1985 supplemental motion for an interim fee award, includes "detailed summaries based on contemporaneous time records indicating the work performed by each attorney for whom fees are sought." *NACV*, 675 F.2d at 1327. These summaries were actually prepared by a government paralegal based upon a review of plaintiffs' attorneys' actual time records, which were made available to the government after the initial fee petition was filed in 1981. Although the government complains that these summaries lack the specificity required by the *NACV* decision, the Court believes that on the whole they contain sufficient and adequate information on which to base a reasonable fee award. Plaintiffs are not required to document the "exact number of minutes spent nor the precise activity to which each hour was devoted nor the spe-

cific attainments of each attorney." *Copeland,* 641 F.2d at 891 (quoting *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir.1973)). The government may quibble over individual entries, claiming they are vague or unclear. However, in the context of the entire application, the entries enable this Court to make an independent, intelligent, and reasonable determination whether or not the hours claimed are justified. *See NACV,* 675 F.2d at 1327.

Apart from its general objection to the specificity of the time entries, the government raises a number of challenges to the reasonableness of the hours claimed. In keeping with Judge Tamm's admonition in his concurring opinion in *NACV,* the Court will analyze the "issues" raised by the government's opposition to determine if detailed scrutiny of the time entries or a percentage reduction in the award is appropriate. *NACV,* 675 F.2d at 1328 (Tamm, J., concurring).

### a. Billing Judgment

The government argues that the billing judgment exercised by Hogan & Hartson did not sufficiently exclude excessive time. It also contends that the failure of the firm to itemize hours eliminated by billing judgment makes it impossible to calculate accurately the lodestar since different hourly rates must be applied to work performed in different years. Finally, it disputes the affidavits of the several public interest lawyers involved which state that they exercised billing judgment in preparing their time entries.

The Bradford Declaration indicates that Hogan & Hartson reduced the hours claimed by 9.6 percent in the exercise of billing judgment. The affidavit indicates the hours subtracted from the claims of the 12 attorneys, one law clerk, and one paralegal who worked on the case, but does not specify which of the recorded hours have been dropped. It is still possible to determine how many hours were subtracted per year for each attorney by comparing the total number of hours recorded, summarized in Exhibit E of the Bradford Declaration, with the number of hours claimed, shown in paragraph 9.[11] Therefore, contrary to the government's assertion,[12] calculation of the lodestar is not impeded by any lack of specificity in the report of billing judgment.[13]

■ The magnitude of the percentage reduction is not as impressive as plaintiff claims, however, because nearly 40 percent of the hours subtracted were hours recorded by the firm's paralegal. When those hours are withdrawn from the calculation, the percentage reduction for the firm as a whole, falls to just over 6 percent. Nonetheless, with one exception explained below, the Court finds that the number of hours eliminated through billing judgment was reasonable.[14] As might be expected, a

---

**11.** For example, Peter Raven-Hansen recorded entries totaling 198.75 hours for 1978–1980 as follows: 1978—55 hours; 1979—86.75 hours; 1980—57 hours. Paragraph 5 of the Bradford affidavit indicates that Hogan & Hartson excluded 127.5 of those hours in the exercise of billing judgment. Paragraph 9 indicates the hours actually claimed for work by Raven-Hansen: 1978—40 hours; 1979—70.5 hours; 1980—17 hours. Therefore, the hours eliminated by Hogan & Hartson were: 1978—15 hours; 1979—16.25 hours; 1980—40 hours.

**12.** Defendant's Memorandum in Opposition to Plaintiffs' Supplemental Motion for Interim Award of Costs and Attorneys' Fees, Dec. 11, 1985, at 5.

**13.** Comparisons of this nature also indicate that at least some of the hours specifically challenged by the government in their exhaustive

critique of the plaintiffs' submission had already been eliminated in the exercise of billing judgment. For example, none of the 11.5 hours recorded by Bruce Wolk in 1976 were billed. *Compare* Defendant's Notice of Filing and Supplemental Memorandum ("Defendant's Supplemental Memorandum"), Dec. 18, 1985, section 2, at 14, *with* Bradford Declaration, ¶ 9.

**14.** The government has identified 247.75 hours of entries which it considers unreasonable on their face and therefore indicative of a lack of billing judgment. Plaintiffs have specifically and sufficiently responded to the challenges to many of those entries. *See* Plaintiffs' Reply to Defendants' Opposition, Jan. 6, 1986, at 14. The Court is very skeptical of the criticism of many others. In addition, a large number of the challenged entries are also included in the more general challenges discussed later in this opin-

higher percentage of hours was eliminated from the entries of less experienced attorneys than from the claims of senior attorneys. Furthermore, a lower percentage of hours was deducted from entries by attorneys who worked on the case in its early stages than from those of lawyers who came on board in later years and needed to spend time reviewing the files and familiarizing themselves with prior proceedings.

■ The lead counsel for the plaintiffs from inception of the litigation to the present has been Douglas Parker. He was at first an associate at Hogan & Hartson and later joined the Institute for Public Representation. Mr. Parker has performed with admirable skill and resourcefulness throughout the history of this litigation. His work reflects high standards of professional competence. Still, the Court finds it difficult to accept that out of the 1221.75 hours he recorded in this case from 1973–1975, Hogan & Hartson determined that only 11.5 should be eliminated. It would appear that even the most efficient and talented lawyer spends unproductively more than .9 percent of over 1200 hours of recorded time.[15] When Mr. Parker's hours, as well as the paralegal's hours, are excluded from the billing judgment calculation, 9.6 percent of the Hogan & Hartson attorney time has been eliminated. The Court will subtract an additional 106 hours from Mr. Parker's claim to bring his deducted hours up to this level. The additional deductions will be divided equally among the three years involved.

■ Public interest attorneys Roderic V.C. Boggs, Dale Swartz, and Douglas Parker have affirmed that they exercised billing judgment *prior* to recording their time in this proceeding.[16] The Court accepts the sworn statements of these highly respected attorneys. The hours that they claim are not excessive given the vigorous opposition presented by the government at every turn. And all of this time was recorded and claimed prior to *NACV.* Just as the attorneys' fees claims for hours expended prior to that decision are not required to be based on contemporaneous time records, *Action on Smoking and Health v. Civil Aeronautics Board,* 724 F.2d 211, 220 (D.C.Cir.1984), it would not be feasible to require these attorneys to determine, after the fact, exactly how billing judgment was exercised. Billing judgment is an inherently subjective practice. Abuse of that judgment by the public interest firms has not been demonstrated and no further exclusion of time is warranted. *See Cook v. Block,* 609 F.Supp. 1036, 1041 (D.D.C.1985) (approving fee petition although, contrary to "preferred practice," nonbillable hours not specifically recorded).

### b. Attorney Conferences

In a detailed supplement to its opposition to plaintiffs' motion, the government argues and attempts to document that plaintiffs' attorneys spent an inordinate amount of time conferring with one another and

ion. In any event, the total number of "questionable" hours amount to only 6 percent of the total recorded hours, which total has been reduced in the exercise of billing judgment. In sum, no reductions are justified based on this part of defendant's response except for 2.75 hours of Douglas Parker's time in 1973 which plaintiffs admit was inadvertently charged to the wrong account.

**15.** It should be noted that during this period Mr. Parker was not exercising independent billing judgment as he was during the years when he was responsible for the case at the Institute for Public Representation.

**16.** *See* Affidavit of Roderic V.C. Boggs ¶ 4, Plaintiffs' Application for Costs and Attorneys' Fees, Apr. 20, 1981, Exhibit E; Affidavit of Dale Swartz ¶ 5, Plaintiffs' Application, Exhibit D; Affidavit of Douglas Parker ¶ 7, Plaintiffs' Application, Exhibit C. Mr. Swartz estimates that he recorded approximately half of the time he actually spent on the case from March 1978 to January 1981. Mr. Parker claimed time that he spent as well as small claims for two graduate fellows employed by the Institute for Public Representation. The Court notes also that Mr. Parker's entries include references to law students working at the Institute. No claim for time spent by these students is made although their time is compensable in this Circuit. *See Jordan v. United States Department of Justice,* 691 F.2d 514, 524 (D.C.Cir.1982). This is further evidence that appropriate billing judgment was used.

that this time should not be double or triple billed to the defendant. The Court does not find that the time spent in conferences was excessive and no reduction will be made as a result of this challenge.

 While the government states that the extracted entries it relies on reflect 752 hours spent solely in conferences,[17] a significant number of those entries also cover other activities. The Court's time is not profitably spent reviewing these records in an effort to arrive at a more accurate figure. It is sufficient to state that conferences between attorneys to discuss strategy and prepare for oral argument are an essential part of effective litigation. And further, in a lengthy, complex proceeding such as this one, it is not unusual or unexpected that some new lawyers, when brought on board the litigating team, will have to be briefed on the status of the proceeding.[18] Most important, meetings between junior and senior lawyers to discuss the progress of research and review completed assignments are reasonable and appropriate means to secure proper supervision and efficient staffing of large class actions cases such as this. *See NACV*, 675 F.2d at 1337. Such supervision is necessary to avoid wasteful or disorganized efforts by inexperienced lawyers keeping fee claims within reasonable bounds. *Copeland*, 641 F.2d 880.[19] The Court does not find that excessive or unnecessary conferences were held in this case, and there is no reason or authority for allowing only one lawyer to charge for time that more than one lawyer justifiably spent.

### c. Court Attendance

 The same cannot be said about duplicative time charged for attending status calls, hearings, and other proceedings before this Court. When plaintiffs chose to send two or three lawyers to sit silently in court beside the lead attorney, the defendant should not be charged for that time. In this instance, plaintiffs' failure to indicate exactly which hours have been eliminated as a result of billing judgment will be charged against them. For routine status calls, the Court will permit a claim for only the attorney who appeared. For major oral argument or hearings, the most senior additional attorney will also be compensated. In the exercise of discretion, reductions made under this approach are as follows:

| Attorney | Year | Hours |
| --- | --- | --- |
| **Hogan & Hartson** | | |
| Tatel | 1975 | 1.25 |
| D. Parker | 1975 | 1.25 |
| Wolk | 1977 | 2.50 |
| Minceberg | 1977 | 4.00 |
| | 1980 | 2.25 |
| Raven-Hansen | 1979 | 4.75 |
| **Washington Lawyers' Committee for Civil Rights Under Law** | | |
| Swartz | 1979 | 1.25 |
| **Institute for Public Representation** | | |
| D. Parker | 1978 | 1.25 |
| | 1980 | 1.50 |
| Schwartz | 1978 | 1.00 |
| | | 21.00 |

The extremely small reduction of hours that resulted from this challenge illustrates the importance of exercising and explaining reasonable billing judgment and the absurdity of minute judicial examination of time entries.

### d. Particular Tasks

The government raises a battery of objections to the amount of time spent by plaintiffs' lawyers on the preparation of particular pleadings. The Court has con-

---

17. Defendant's Supplemental Memorandum at 1.

18. This may be even more true when a case is handled *pro bono*. It is simply unrealistic to expect that a firm will devote the same attorneys to a case of this nature over a period of 13 years. Normal turnover in a firm and efficient use of attorney time will demand some changes in the staffing of a case. Indeed, no less than eight AUSAs have now had primary responsibility for the defendant's pleadings. From the

standpoint of attorneys' fees, the government is fortunate that two of plaintiffs' lead attorneys, Douglas Parker and Dale Swartz, continued to work on the case after leaving Hogan & Hartson.

19. It is especially relevant that most of the time that senior attorneys such as Roderic V.C. Boggs and David Tatel claim in this case is for such supervisory activities. Contrary to the government's argument, this demonstrates plaintiffs' counsel's efforts to efficiently staff the litigation.

sidered these challenges and determines that no reductions in the hours claimed are warranted. "It is neither practical nor desirable to expect the trial court judge to [review] each paper in this massive case file to decide, for example, whether a particular motion could have been done in 9.6 hours instead of 14.3 hours." *Copeland*, 641 F.2d at 903. To the extent the government's papers are meant to invite the Court to undertake such a task, the invitation is declined. To the extent that the objections are simply meant to constitute evidence of shortcomings in plaintiffs' billing judgment, that objection has been considered previously. Including the additional reduction of Mr. Parker's time, as noted *supra*, the total hours claimed by Hogan & Hartson attorneys are 9 percent less than those shown in the time entries. As stated above, this reduction is reasonable and sufficient given the complexity of the case and the tenacious litigating posture of the government throughout this proceeding.[20]

▮ The government identifies one instance of purportedly excessive time spent on a particular pleading that deserves further comment. Plaintiffs filed an unsuccessful motion to reconsider after the Court in 1974 remanded the proceeding to the GPO. Some courts have refused to compensate for time spent on such pleadings. *See, e.g., Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 364 (D.D.C. 1983), *aff'd in part and rev'd in part on other grds.,* 746 F.2d 4 (D.C.Cir.1984). In this case, however, subsequent developments in the law and in this proceeding suggest that the position taken by plaintiffs in their motion was, in hindsight, substantially justified.[21] The Court believes, therefore, that the hours spent pursuing

the motion to reconsider were a reasonable and prudent investment of time.

▮ On the other hand, the government should not be charged for time spent preparing plaintiffs' unsuccessful opposition in early 1980 to a motion to intervene filed by the Washington Printing and Graphic Communications Union No. 1. Therefore, a reduction of Peter Raven-Hansen's (9 hours) and Douglas Parker's (3.5 hours) 1980 claims is appropriate. Again, while some of this time may already have been deducted in the exercise of billing judgment,[22] plaintiffs' failure to specifically identify such deductions will be held against them.

▮ In conclusion, in accordance with the above discussion, the Court calculates an interim lodestar of $238,625.00 for the years 1973–1980, as set out in the following table:

| Attorney | Year | Rate | Hours | Lodestar |
|---|---|---|---|---|
| **Hogan & Hartson** | | | | |
| Ferren | 1973 | $70.00 | 4.5 | $ 315.00 |
| | 1974 | 85.00 | 2.25 | 191.25 |
| Tatel | 1974 | 75.00 | 41.0 | 3,075.00 |
| | 1975 | 75.00 | 13.0 | 975.00 |
| | 1977 | 95.00 | 6.25 | 593.75 |
| D. Parker | 1973 | 40.00 | 174.5 | 6,980.00 |
| | 1974 | 45.00 | 439.5 | 19,777.50 |
| | 1975 | 60.00 | 485.75 | 29,145.00 |
| Polmer | 1973 | 35.00 | 123.75 | 4,331.25 |
| | 1974 | 40.00 | 148.75 | 5,950.00 |
| | 1975 | 55.00 | 53.0 | 2,915.00 |
| | 1976 | 60.00 | 5.75 | 345.00 |
| Swartz | 1977 | 45.00 | 378.5 | 17,032.50 |
| | 1978 | 50.00 | 110.0 | 5,500.00 |
| Wolk | 1977 | 50.00 | 323.5 | 16,175.00 |
| Minceberg | 1977 | 40.00 | 39.25 | 1,570.00 |
| | 1978 | 40.00 | 11.0 | 440.00 |
| | 1979 | 60.00 | 1.0 | 60.00 |
| | 1980 | 75.00 | 4.25 | 318.75 |
| Raven-Hansen | 1978 | 65.00 | 40.0 | 2,600.00 |
| | 1979 | 80.00 | 65.75 | 5,260.00 |
| | 1980 | 90.00 | 8.00 | 720.00 |
| McClearyCale | 1978 | 40.00 | 62.00 | 2,480.00 |
| Keeney | 1979 | 65.00 | 18.00 | 1,170.00 |

20. The Court notes that the defendant filed two motions to reconsider class certification and a motion to reconsider the 1977 decision on summary judgment, none of which were successful, and all of which required extensive opposition by plaintiffs.

21. *Hackley v. Roudebush,* 520 F.2d 108 (D.C.Cir. 1975), and *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), established that a trial *de novo,* is available to federal employees alleging violations of Title VII. In addi-

tion, after a lengthy delay, it became clear that further administrative proceedings would not lead to a resolution of plaintiffs' allegations. The case was decided on cross motions for summary judgment, based on the same record that was available to the Court and the parties before remand.

22. The Court notes that Mr. Raven-Hansen's claim for 1980 is already reduced by 40 hours from the 57 hours recorded on his time sheet summaries for that period.

| Attorney | Year | Rate | Hours | Lodestar |
|---|---|---|---|---|
| **Hogan & Hartson** | | | | |
| Moody | 1980 | 60.00 | 33.25 | 1,995.00 |
| Wolff | 1980 | 65.00 | 27.5 | 1,787.50 |
| Stone (law clerk) | 1977 | 25.00 | 33.25 | 831.25 |
| Moore (paralegal) | 1976 | 25.00 | 15.0 | 375.00 |
| | 1977 | 30.00 | 8.25 | 247.50 |
| **Total (Hogan & Hartson)** | | | 2,676.50 | $133,156.25 |

**Washington Lawyers' Committee for Civil Rights Under Law**

| Attorney | Year | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Boggs | 1973 | 65.00 | 8.0 | 520.00 |
| | 1974 | 75.00 | 15.0 | 1,125.00 |
| | 1975 | 80.00 | 17.5 | 1,400.00 |
| | 1977 | 105.00 | 51.25 | 5,381.25 |
| | 1978 | 120.00 | 13.25 | 1,590.00 |
| Swartz | 1978 | 50.00 | 58.5 | 2,925.00 |
| | 1979 | 80.00 | 65.25 | 5,220.00 |
| | 1980 | 90.00 | 22.5 | 2,025.00 |
| **Total (Washington Lawyers' Committee)** | | | 251.25 | $ 20,186.25 |

**Institute for Public Representation**

| Attorney | Year | Rate | Hours | Lodestar |
|---|---|---|---|---|
| D. Parker | 1977 | 105.00 | 180.5 | 18,952.50 |
| | 1978 | 115.00 | 130.0 | 14,950.00 |
| | 1979 | 130.00 | 99.0 | 12,870.00 |
| | 1980 | 140.00 | 241.0 | 33,740.00 |
| Schwartz | 1978 | 40.00 | 18.75 | 750.00 |
| Tanaka | 1980 | 60.00 | 67.0 | 4,020.00 |
| **Total (IPR)** | | | 736.25 | $ 85,282.50 |
| **Total** | | | 3,664.0 | $238,625.00 |

## II. Costs

Plaintiffs' attorneys assert a claim for reimbursement of expenses of less than $7,000. They are entitled to all expenses associated with the litigation that they would normally expect to pass on to fee paying clients. *Laffey*, 746 F.2d at 30. Defendants complain that overtime compensation for secretarial work should not be awarded and that the charge for local transportation is unreasonable. David Tatel, a Hogan & Hartson partner, affirms that secretarial overtime is normally charged to fee paying clients. Local transportation charges in this proceeding, amount to an average of $46 per year. That charge cannot be considered excessive by any standard. In fact, given the sometimes astronomical costs of major litigation, the government's strenuous objections to the relatively minor expenses incurred here are puzzling and raise a question of good faith. *Cf. Ramos v. Lamm*, 632

F.Supp. 376, 389 (D.Colo.1986) (assessing costs of $38,957.40); *Laffey*, 572 F.Supp. at 382–85 (awarding costs of $93,822.12). Accordingly, based on the affidavit of David Tatel,[23] the Court accepts the proffered expenses of $6,805.09.

## III. Future Proceedings

At the conclusion of this litigation, the Court will consider whether the lodestar figure set out above should be enhanced based on the contingent nature of the case, the excellence of results obtained, or any other permissible factor. *See generally Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, —— U.S. ——, 106 S.Ct. 3088, 3096–100, 92 L.Ed.2d 437 (1986). As noted above, the question of historical versus current hourly rates may be revisited if appropriate. Plaintiffs' counsel are also entitled to compensation for hours reasonably expended after 1980, including those spent pursuing this interim fee award. The firm of Steptoe & Johnson which recently undertook primary responsibility for the attorneys' fee claim, may also file a petition for fees. *See, e.g., Laffey*, 746 F.2d at 29; *Environmental Defense Fund, Inc. v. EPA*, 672 F.2d 42, 62–63 (D.C.Cir.1982). The parties are strongly encouraged to resolve through negotiation future attorneys' fees petitions, thereby avoiding a "third major litigation."

It has now been nearly thirteen years since this case was filed, and plaintiffs' attorneys have yet to receive a penny for their highly successful efforts. They have therefore suffered a financial loss which, under current law, cannot be compensated. Throughout the proceeding, reflecting the best spirit of the public interest bar, these lawyers have fully represented their clients' interests without regard to the dwindling chances of ever receiving full compensation. The interim lodestar figure approved today, in the Court's view, does not even remotely represent the value of the services they provided their clients and society as a whole. As an interim award, however, given the constraints of current

**23.** Plaintiff's Application for Costs and Attorneys' Fees, Apr. 30, 1981, Exhibit A.

case law and the circumstances of this case, it is fair and reasonable.

An appropriate order will be entered.

**ORDER**

In accordance with the Memorandum Opinion entered herewith, it is this 12th day of September, 1986,

**ORDERED**

That defendant shall pay to plaintiffs' counsel attorneys' fees of $238,625.00 and costs of $6,805.09, representing an interim award of fees and costs covering the period 1973–1980.