Dorothy M. THOMPSON, et al., Plaintiffs,

v.

Ralph E. KENNICKELL, Jr., Public Printer, Defendant.

Civ. No. 74–1101 (CRR).

United States District Court, District of Columbia.

March 30, 1989.

Roger E. Warin, Bryan T. Veis and Sharon L. Davies, Steptoe & Johnson, Washington, D.C., for plaintiffs.

Robert C. Seldon, Jay B. Stephens and John D. Bates, Office of the U.S. Atty., Washington, D.C., of counsel, Drew Spalding, Deputy Gen. Counsel, Government Printing Office, for defendant.

CHARLES R. RICHEY, District Judge.

Like an old, unwanted shoe that continues to turn up, this matter is again before the Court on remand from the Court of Appeals. In *Thompson v. Kennickell*, 836 F.2d 616 (D.C.Cir.1988), the Court of Appeals decided several issues relating to plaintiffs' application for attorney fees, but remanded for decision on two others. The remaining issues are: (1) the historical hourly rate at which Roderic V.O. Boggs should be compensated for time spent in this litigation; and (2) whether a contingency enhancement should be applied to the lodestar figure for all attorneys in this litigation. In addition, as to the first issue, the Court of Appeals specifically directed this Court to determine whether a 1978 settlement agreement that Mr. Boggs filed in an unrelated case, in which he stipulated to an hourly rate of $60, establishes his normal hourly billing rate for purposes of this matter.

As described further below, the Court finds that Mr. Boggs' 1978 stipulation is legally irrelevant to a determination of the reasonable hourly rate plaintiffs are entitled to receive for Mr. Boggs' services in this lawsuit. Instead, the Court concludes that Mr. Boggs' hourly rate should be set by reference to rates charged during the

same period by the law firm of Hogan & Hartson. Further, the Court agrees with the plaintiffs that a contingency enhancement of 100% is necessary and appropriate in the circumstances of this case. The record indicates that the local private market for legal services treats contingent fee cases, as a class, differently than non-contingent fee cases. The record further indicates that, absent a contingency enhancement of the magnitude here sought, the plaintiffs would have faced substantial difficulties in finding counsel in the local market. *Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (O'Connor, J., concurring) (establishing criteria for contingency enhancements). Thus, the Court awards the plaintiffs a total attorneys' fee of $1,732,700.[1]

## I. MR. BOGGS' HOURLY RATE

### A. *The 1978 Stipulation in the Bryant Litigation*

█ The Court first addresses the significance of the 1978 stipulation Mr. Boggs executed in settling *Bryant v. Benevolent and Protective Order of Elks*, C.A. No. H–75–1864 (D.Md.1978). The Court of Appeals appears to have attached some importance to the stipulation, remanding the matter to this Court for a determination of whether the stipulation establishes Mr. Boggs' "normal hourly rate." *Thompson*, 836 F.2d at 620.[2] The Court of Appeals expressly directed this Court to assess the stipulation in light of the standards articulated in *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 15–25 (D.C.Cir.1984), *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 47–50 (D.C.Cir.1987) (panel decision), and *Blum v. Stenson*, 465 U.S. 886, 892–96, 104 S.Ct. 1541, 1545–47, 79 L.Ed.2d 891 (1984). *Thompson*, 836 F.2d at 620.

The Court concludes that Mr. Boggs' 1978 stipulation is of no significance whatsoever. First, two of the decisions that the Court was to consider on remand—*Laffey* and the panel decision in *Cumberland Mountains*—no longer represent controlling authority, having been found to depart from the teachings of the third and necessarily dispositive case, *Blum*. See *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C.Cir.1988) (*en banc* opinion) (reversing *Laffey* in substantial part and vacating the panel decision in *Cumberland Mountains*). What is of more importance, however, the reasoning of the *en banc* opinion in *Cumberland Mountains*, which resurrected and reinstated the true teachings of *Blum* in this Circuit, makes clear that even if Mr. Bogg's 1978 stipulation is what the Government claims it is— an accurate statement of the value Mr. Boggs attached to his services in 1978[3]—that fact is without legal significance.

This conclusion flows from *Cumberland Mountains'* implicit repudiation of the notion, articulated in *Laffey*, that an attorney's fee award should always be capped by the opportunity cost of the attorney's services, i.e., the fee that the attorney has charged in the past in providing similar services.[4] Under *Laffey*, as well as the

---

**1.** The Government has apparently made previous payments of $825,611.25. Thus, the effect of this Order is to direct the payment of an additional $907,088.75.

**2.** In the stipulation, Mr. Boggs stated that his hourly rate in 1978 was "normally $60 per hour." The stipulation was contained in a document presented to a Maryland District Court for approval of a settlement agreement relating to litigation lasting several years. According to Mr. Boggs' affidavit filed in this matter:

> The stipulation was not intended to suggest that at that time I had an established hourly billing rate which I charged and was paid by non-contingent clients. Instead, it was simply a rate selected to demonstrate that the settlement [of the *Bryant* litigation] was fair and appropriate. In selecting that rate, I did not make any effort to establish what an appropriate market rate would have been for an attorney of my experience and expertise.

Boggs Aff. at ¶ 3 (Plaintiffs' Exhibit I(A)).

**3.** *See* Defendant's Resp. to Plaintiffs' Supp.Mem. at 5 (July 12, 1988) ("The $60 hourly rate for the services of class counsel in 1978 is the only accurate, fair, and consistent statement of the value of [Mr. Boggs] services.").

**4.** *See Laffey*, 746 F.2d at 18 ("By setting the fee award at the attorney's customary billing rate, the opportunity cost of foregone representations

panel decision in *Cumberland Mountains,* the attorney's historical rates—even when below prevailing rates charged by others in the same market—provided the upper limit to the hourly rate that the attorney could obtain in a fee award. This was because, under the reasoning of *Laffey,* the attorney's historical rate was all that would be required to obtain the attorney's services— i.e., it represented his or her opportunity cost with respect to the type of representation at issue. In the view of the *Laffey* majority, no more was required to effectuate the objectives of fee shifting in civil rights actions, as the opportunity cost of an attorney's services were deemed to represent a "reasonable" fee. *Laffey,* 746 F.2d at 18.

The reasoning of the *en banc* opinion in *Cumberland Mountains* implicitly but clearly rejected that view. *Cumberland Mountains* held that a private attorney, who actually charges below-market hourly rates to certain "worthy" clients, will not be limited to those below-market, "actual" rates should his or her "worthy" clients prevail. Instead, the private attorney will be entitled to a fee award based upon higher, prevailing market rates. *Cumberland,* 857 F.2d at 1524. The fact that the lower, below-market rate may have been, or will be in the future, sufficient actually to obtain the attorney's services is without significance. The concept of opportunity cost (as embodied in an attorney's *actual,* below market billing history) as a measure of an appropriate fee award no longer controls. *See Laffey,* 746 F.2d at 32 n. 3 (Wright, J., dissenting) (cases relied upon in legislative history of 42 U.S.C. § 1988 "make clear that Congress did not intend to use historical billing rates as a cap on fee awards") (*cited approvingly* in *Cumberland Mountains,* 857 F.2d at 1523 (*en banc* opinion).

A recent decision of the Supreme Court further confirms that an attorney's *actual* fee expectations when he or she assumes representation are irrelevant to the computation of a fee award. *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (maximum fee award not limited by contingent fee contract based upon percentage of damages).

The *en banc* decision in *Cumberland Mountains* was hardly revolutionary. In fact, it simply returned the rule of this Circuit to first principles, as originally expressed in *Blum v. Stenson,* 465 U.S. at 896, 104 S.Ct. at 1547, 79 L.Ed.2d 891 (1984). In *Blum,* the Supreme Court held that a "reasonable fee" is "to be calculated according to the *prevailing market rates* in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Id.* at 895, 104 S.Ct. at 1547 (emphasis added). *Blum* nowhere suggests that opportunity cost is in any way relevant to the calculation of a reasonable fee. Indeed, *Blum* expressly rejects that position.[5] Thus, *Blum* refutes the contention that an attorney's actual billing history, as an indicium of what is required to attract *that* attorney's services, bears any relevance to the calculation of a reasonable fee.

The foregoing establishes that Mr. Boggs' 1978 stipulation in the *Bryant* litigation is irrelevant to this action. The Court of Appeals implied, and the Government now contends on remand, that the stipulation shows what Mr. Boggs regarded as the worth of his services. The Government argues that because $60 an hour, by Mr. Boggs' own admission, could purchase his services in 1978, he need only be compensated at that level for 1978, and, presumably, at a proportionately low level for the remaining years in question.[6] The

___

is precisely offset by a fee award in the same amount.").

**5.** The Solicitor General, as *amicus curiae,* had argued in *Blum* that a cost-based standard should be adopted for calculating fee awards to public interest attorneys, as costs alone would be sufficient to attract such attorneys to civil rights cases. *Blum,* 465 U.S. at 893, 104 S.Ct. at 1546 (according to the Solicitor General market

rates "include an element of profit unnecessary to attract nonprofit counsel"). The Supreme Court expressly rejected this position in favor of market rates for all attorneys, regardless of cupidity.

**6.** Although the Government is somewhat unclear on this point, it apparently suggests that Mr. Boggs be compensated at a rate for the other years which bears the same relation to the

Court of Appeals undoubtedly meant the same thing when it said that:

> We see no reason why the stipulation—if it provides evidence of [Mr. Boggs'] customary billing rate—does not reflect "the opportunity cost of foregone representations." *Laffey*, 746 F.2d at 18. Accordingly, the stipulation may provide evidence of the presumptively reasonable rate for public-interest counsel.

*Thompson*, 836 F.2d at 620. Yet, because *Cumberland Mountains* implicitly rejected the contention that opportunity costs—as contemplated by the Court of Appeals in *Thompson* and by the Government on remand—play any role in establishing a reasonable fee, this Court refuses to attach any significance to Mr. Boggs' 1978 stipulation. Under *Blum*, and under the *en banc* decision in *Cumberland Mountains*, the stipulation is irrelevant as a matter of law.[7]

### B. The Proper Hourly Rate for Mr. Boggs' Services

In an action not directly related to this one, *McKenzie v. Kennickell*, 645 F.Supp. 437 (D.D.C.1986), Judge Parker of this Court awarded Mr. Boggs, for the years at issue in this action, fees based upon the rates actually charged by attorneys at the Washington, D.C., law firm of Hogan & Hartson. Judge Parker concluded that the rates charged at Hogan & Hartson for attorneys of skill and experience similar to that of Mr. Boggs established the presumptively reasonable market rate for the relevant period. Based upon Judge Parker's findings in *McKenzie*, the plaintiffs suggest that this Court should also award Mr. Boggs rates based upon those charged by Hogan & Hartson for the years at issue.[8]

The Court agrees with the plaintiffs. The rates awarded in *McKenzie* for Mr. Boggs' services are eminently reasonable, and fall clearly within the range of prevailing market rates for the years in question. The Court notes that Judge Parker turned to Hogan & Hartson in *McKenzie* for the perfectly sensible reason that Hogan & Hartson attorneys had assisted Mr. Boggs in that litigation. Here, Mr. Boggs has been assisted by several different sets of attorneys, most recently from the firm of Steptoe & Johnson. While it might have been more precise to have pegged Mr. Boggs' rates in this litigation to pertinent fees charged by Steptoe, the Court finds that the interests of economy support the use of the Hogan & Hartson rates here.

Moreover, it is important to note that the accuracy and reasonableness of the Hogan & Hartson rates have been copiously documented, both here and in *McKenzie* itself. The Government, on the other hand, has offered next to nothing to suggest that those rates are unreasonable, or that they somehow fail to reflect the prevailing rate in the local private market. Instead, the

---

prevailing market rate as $60 per hour bears to the prevailing market rate in 1978.

**7.** Even if this were not the case, and if the 1978 *Bryant* stipulation *were* legally relevant, the Court finds that the stipulation provides insufficient evidence of Mr. Boggs' "customary billing rate." As the plaintiffs clearly show, the stipulation was the by-product of a negotiated settlement of litigation which encompassed several years. By its very nature, then, the rate contained in the stipulation was likely not the rate Mr. Boggs would have charged an actual client, in the same way that a settlement sum rarely reflects either parties' estimation of the amount of damages actually incurred in a lawsuit. Instead, as with a settlement sum, Mr. Boggs' rate likely reflects the best that he could obtain through negotiation—i.e., his *actual* estimate of the value of his services, discounted by the probability that his client would not be a "prevailing party" in the *Bryant* litigation. Accordingly, the Court is unwilling to conclude that the stipula-

tion accurately represents Mr. Boggs' "customary billing rate."

Furthermore, it is simply incorrect to speak in terms of a "customary billing rate" when referring to Mr. Boggs' practice. Unlike the attorneys in *Laffey* and *Cumberland Mountains*, but like the attorneys in *Blum*, Mr. Boggs is a "pure" public interest lawyer. He does not charge, and never has charged, *any* of his clients for his services. Although Mr. Boggs and his organization receive contributions, as well as awards of attorney's fees in successful litigation of this type, no money changes hands between Mr. Boggs and his clients. Thus, the concept of a "customary" or "established" billing rate is meaningless in the context of Mr. Boggs' practice.

**8.** The record in *McKenzie*, including the affidavits submitted in support of the reasonableness of the Hogan & Hartson rates, were also made part of the record in this matter.

Government has placed all of its eggs in the basket of Mr. Boggs' 1978 stipulation. It has offered nothing to refute the reasonableness of the Hogan & Hartson rates. As shown above, however, Mr. Boggs' 1978 stipulation has become irrelevant in light of the *en banc* decision in *Cumberland Mountains.* Accordingly, the Government has failed to meet its burden under *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1326 (D.C.Cir.1982) ("[I]n the normal case the Government must either accede to the applicant's requested rate or provide specific contrary evidence tending to show that a lower rate would be appropriate."). Given the legal irrelevance of its central argument, the Government has offered no "specific contrary evidence" which carries any legal significance. The plaintiffs shall therefore be awarded the reasonable hourly rate for Mr. Boggs' services that they seek in their petition.

## II. THE PLAINTIFFS' ENTITLEMENT TO A CONTINGENCY ENHANCEMENT

 The Court of Appeals also remanded for consideration of whether a contingency enhancement to the lodestar amount is appropriate in this case under the test articulated in Justice O'Connor's concurrence in *Pennsylvania v. Delaware Valley Citizens Council,* 483 U.S. 711, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987). As noted above, in order to obtain a contingency enhancement under *Delaware Valley,* the fee applicant must establish: (1) that the relevant market compensates contingent-fee cases, as a class, differently than it compensates non-contingent fee cases; and (2) that, absent a contingency enhancement, the prevailing party "would have faced substantial difficulties in finding counsel in the local or other relevant market." *Id.* 107 S.Ct. at 3089–91. Based upon the record presented in this case, the Court concludes that such an enhancement is appropriate under Justice O'Connor's test, and that the amount of the enhancement should be 100%.

### A. *Treatment of Contingent–Fee Cases in the Local or Other Relevant Market*

Plaintiffs have submitted a variety of affidavits from various practitioners in the District of Columbia, all intended to support their contention that the "relevant market" treats contingent fee cases differently than non-contingent fee cases.[9] The difference, plaintiffs argue, is that the District of Columbia market requires a fee enhancement of at least 100% above normal hourly rates, and probably as high as 200%, before attorneys will accept contingent fee cases.

At the outset, the Government's response challenges the way in which the plaintiffs' proof addresses the "relevant market" concept articulated in *Delaware Valley.* According to the Government, the plaintiffs' proof is skewed in favor of large, established firms and prominent practitioners. These types of attorneys, the Government contends, do not need contingent fee cases for their survival, and are thus in a position to demand substantial enhancements as a precondition to contingent fee representation. The Government argues that the *real* "relevant market" for attorneys engaged in Title VII litigation is not as elite and discriminating as the plaintiffs' proof would suggest, and does not require the type of enhancement the plaintiffs seek. The Government thus contends that because the plaintiffs' market definition is too broad, and includes information from attorneys that are not part of the "relevant" market, they have not satisfied the first prong of Justice O'Connor's test.

The Court disagrees with the Government, and finds that the plaintiffs have met their burden of proving that the "relevant market" in the District of Columbia treats contingent fee cases differently than non-contingent fee cases.

Initially, the Court rejects the Government's contention that Justice O'Connor, by using the term "relevant market," in-

---

**9.** As with most of the proof plaintiffs have offered in this proceeding, nearly all of the affida- vits were originally executed in connection with previous fee litigation in this Court.

tended to import into attorney's fee litigation concepts of market definition and product interchangeability as developed under antitrust law.[10] In this Court's view, to do so would be patently inconsistent with Justice Powell's admonition in *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), that "[a] request for attorney's fees should not result in a second major litigation." The sophisticated studies, expensive experts and attorney time which go into the development of a "relevant market" for antitrust purposes simply have no place in the attorney's fee phase of litigation. This Court finds no rational basis for concluding that Justice O'Connor intended to produce such a convulsion in this area of the law.[11]

Market concepts aside, the Government further suggests that because the plaintiffs' affidavits do not comprise a valid statistical sample of the District of Columbia market (broadly defined) they fail to satisfy the *Delaware Valley* test. The Court rejects this argument. While the plaintiffs' proof may lack statistical validity, it is also true that a federal court is not a seminar in advanced mathematics. The precision of a statistician is not a prerequisite to a civil judgment. Further, the Court finds no suggestion in Justice O'Connor's opinion that a statistically valid sample is a *sine qua non* of a contingency enhancement. Thus, the question is not whether the plaintiffs' proof is faulty from a sampling perspective. Rather, it is whether the plaintiffs' proof, taken as a whole, satisfies the "preponderance of the evidence" test; if so, the plaintiffs' proof may serve as the basis for a contingency enhancement.[12] The Court finds that the plaintiffs' proof in this case—mathematically imprecise as it may be—establishes by a preponderance of the evidence that the attorney market in the District of Columbia requires contingency enhancements of 100% to 200%.[13]

Finally, the Government places great reliance upon a study of law firm billing rates compiled by Altman & Weil, Inc., a management consulting firm. The Altman

**10.** The Government's brief quoted from the Supreme Court's seminal antitrust opinion in *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), in suggesting the proper market analysis: "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Defendant's Mem. at 13. The Government further quoted from *Brown Shoe* in proposing that the District's pool of attorneys be further refined into submarkets for the purpose of assessing attorney's fees:

 [W]ithin this broad market, well-defined submarkets may exist which, in themselves, constitute product markets.... The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition ... of the product's peculiar characteristics and uses ... distinct customers [and] distinct prices....

 Defendant's Mem. at 14 (quoting *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1523).

**11.** The Court notes as an aside that the Government's antitrust argument, relying as it does upon the concept of submarkets, may well shoot the Government in the foot. The Government seeks to divide the District of Columbia attorney market into "risk-averse," elite practitioners on the one hand, and less stable and experienced contingent practitioners on the other. The Government would look to whatever the latter submarket requires by way of risk enhancement, if anything, and compensate the plaintiffs at that level. It is worth noting, however, that the plaintiffs were throughout this litigation represented by counsel which clearly fall within the class of established, "risk-averse" practitioners who require a substantial contingency enhancement. Thus, if we are playing the submarket game, it would seem that this case would fall within the market which the plaintiffs' proof has, in fact, addressed. The "relevant market," given the actual facts of this case, might well be that which the plaintiffs' proof has effectively defined. If that is so, the Government's argument would have the unintended effect of providing a more precise and technical basis for awarding the plaintiffs the 100% contingency enhancement they seek.

**12.** Obviously, statistical invalidity and faulty sampling practices are relevant to determining whether the standard of proof has been met. They are not, however, as the Government seems to suggest, dispositive.

**13.** *See, e.g., Black Grievance Comm. v. Philadelphia Elec. Co.,* 690 F.Supp. 1393, 1401 (E.D.Pa. 1988) (rejecting contention that statistical invalidity of plaintiffs' random affidavit evidence bars contingency enhancement; "[w]hile plaintiffs' evidence is not ... statistically significant, it does meet the requirements of *Delaware Valley II*").

& Weil study contains a comprehensive survey of the hourly rates charged by law firms of all sizes around the country. The Government contends that because the Altman & Weil study indicates that many lawyers, in markets analogous to the District of Columbia,[14] charge hourly rates that *after* enhancement would be equal to, or less than, many of the hourly rates charged here, a risk enhancement is not required to attract competent counsel.

The Government's argument is not well taken. The average hourly rates that attorneys charge in non-contingent fee cases are simply irrelevant to the question posed under Justice O'Connor's test: Does the local or other relevant market compensate contingent fee cases *differently* than non-contingent fee cases? In light of this question, the hourly, non-contingent rate charged by attorneys in similar markets has meaning only insofar as it relates to the average rate charged in contingent fee cases. If it is less, then the analysis proceeds to the second prong of Justice O'Connor's test. Standing alone, however, the average hourly rate has no value. It merely implicates one side of the equation. If anything, the Government's citation to the Altman & Weil study may be relevant in determining whether Hogan & Hartson's average hourly rates are accurate proxies for the rates charged in the community as a whole. The Government, however, did not offer the study for that purpose. As presented, the study has no relevance to the contingency enhancement issue.

A final factor favoring the Court's conclusion is the fact that other Judges of this Court have previously concluded that the legal market in the District of Columbia treats contingent fee cases differently than non-contingent fee cases. In *King v.*

*Palmer*, No. 83–1980, 1988 WL 104970 (D.D.C. Sept. 20, 1988) (Oberdorfer, J.), *McKenzie v. Kennickell*, 684 F.Supp. 1097 (D.D.C.1988) (Parker, J.) and *Palmer v. Shultz*, 679 F.Supp. 68 (D.D.C.1988) (Smith, J.), three Judges of this Court have concluded that the local market requires compensation for risk. *See, e.g., Palmer v. Shultz*, 679 F.Supp. at 74 ("the Court finds that plaintiffs have clearly established that attorneys in the Washington, D.C. community will ordinarily not take cases on a contingency basis without an upward adjustment of their normal hourly rate of at least 100 percent").

These previous findings must be viewed in light of Justice O'Connor's admonition in *Delaware Valley* that "District Courts and Courts of Appeals should treat a determination of how a particular market compensates for contingency as controlling future cases involving the same market." 107 S.Ct. at 3090.[15] Thus, while the prior findings in this Court may not wholly prohibit a reconsideration of the local market's treatment of contingency cases,[16] those findings are entitled to very substantial weight. The Court has been given no persuasive reason to deny the findings of Judges Oberdorfer, Parker and Smith the weight they deserve, and thus becomes the fourth to conclude that the legal market in the District of Columbia requires an enhancement to an attorney's average hourly rate as compensation for the risk of non-success in a contingent fee case.

### B. *Difficulty in Obtaining Counsel*

Under the second prong of Justice O'Connor's test, a fee applicant—in this case the plaintiff class—must show that without a contingency enhancement, it "would have" faced substantial difficulties

14. The study evaluated billing practices by geographic location, i.e., the Northeast, and did not categorize its results in terms of particular metropolitan areas. Thus, although information from Washington firms is included in the survey, information specific to Washington is lacking.

15. Justice O'Connor continued, in language worth quoting: "Haphazard and widely divergent compensation for risk can be avoided only

if contingency cases are treated as a class; and contingency cases can be treated as a class only if courts strive for consistency from one fee determination to the next." 107 S.Ct. at 3090.

16. *See, e.g., King v. Palmer,* slip op. at 4 ("Justice O'Connor's opinion suggests, if it does not mandate, that each court let a determination such as Judge Smith's control future cases such as this one.").

in obtaining competent counsel. *Delaware Valley,* 107 S.Ct. at 3091. To some extent, of course, an affirmative answer to the first prong of Justice O'Connor's test suggests that the answer to the second prong should be affirmative as well. The difference between the two prongs is merely that between the general and the specific. Accordingly, if the market generally requires an enhancement for contingent fee cases, it seems reasonable to assume that an individual plaintiff (or, as here, a class of plaintiffs) would have encountered difficulties obtaining counsel in a specific case were such an enhancement not available.

The plaintiffs have offered ample evidence that, without the prospect of a contingency enhancement, they would have encountered substantial difficulties in obtaining representation as a class. The plaintiffs' numerous affidavits make clear that Title VII class actions, particularly those in which the Government is the defendant, are unwieldy and difficult affairs, with which few attorneys wish to become involved absent the prospect of receiving either normal non-contingent fees or heightened compensation for contingency.[17] Moreover, the plaintiffs' evidence shows that Dorothy Thompson, lead plaintiff in this case, actually approached a private attorney (before she brought the matter to the Washington Lawyers' Committee for Civil Rights Under Law) who rejected her case because of the risk of non-payment.

The sum of the Government's response is that Mrs. Thompson and her class clearly did not face difficulties in obtaining counsel in this case due to the involvement of Mr. Boggs, the Washington Lawyers' Committee for Civil Rights Under Law, and the private attorneys with which they are in contact. The Government suggests, in es-sence, that this public interest apparatus paves the way for Title VII plaintiffs, and that its existence removes any difficulty these plaintiffs might otherwise have in obtaining counsel. As proof, the Government points to the numerous Title VII actions that have been instituted against agencies of the United States in recent years.

The Government's argument fails in at least three respects. First, the Government ignores the *raison d'etre* of the Lawyers' Committee and other public interest organizations in the first place—to overcome the problems plaintiffs encounter in obtaining private representation. The existence of these organizations, in large part, is a testament to the private legal market's inability, or unwillingness, to provide such plaintiffs with adequate representation on a contingent basis. Thus, rather than undermining the plaintiffs' argument, the Government's position on this point tends to confirm it. Second, the Government's citation to the numerous employment discrimination actions against federal agencies lacks any description of whether the plaintiffs in those actions encountered problems in obtaining counsel, or even whether they were taken on a contingent fee basis. Standing alone, the fact of extensive litigation against the Government proves nothing, and has little probative value as to the question before the Court.[18]

Finally, and perhaps most important, the Government's argument ignores the fact that, in this context, the Lawyers' Committee functions largely as a broker between plaintiffs and private law firms. The Lawyers' Committee's willingness to entertain a matter—particularly a Title VII class ac-

---

**17.** *See, e.g.,* Deposition of Jane Lang McGrew at 29 ("I very much enjoy my work in the Title VII area. I think I am very knowledgeable and an effective lawyer in this area. But I wouldn't touch one against the government because of the difficulty in getting paid for that work."); Supp.Aff. of Roderic V.O. Boggs at 2 ("In 1972 and 1973, although there were at that time approximately 11,000 members of the District of Columbia Bar, the Lawyers' Committee had only identified approximately six law firms willing to consider taking class action employment discrimination cases on a contingent fee basis. The overwhelming majority of District of Columbia firms (and attorneys) were unwilling to handle such cases unless they were paid their normal hourly rates on a noncontingent basis.").

**18.** As the plaintiffs point out, the Government's evidence on this point proves little except that it has been a Title VII defendant with great frequency. Plaintiffs' Reply at 31.

tion—does not assure that a plaintiff's complaint will ever see the inside of a courtroom. Instead, the Lawyers' Committee must first analyze the facts and the law, and then persuade a private firm to assist it in the ensuing ligitigation.[19] Of course, Lawyers' Committee attorneys participate in the litigation, and play major roles, as did Mr. Boggs in this case. If the Lawyers' Committee cannot convince a private firm to provide assistance, however, the matter will often die. The expectations of *private* firms and practitioners are therefore crucial in determining the availability of counsel in matters such as these. The fact that the Lawyers' Committee *exists* proves nothing in this context. The dispositive question is whether, absent an enhancement for risk, the Lawyers' Committee would encounter substantial difficulty in convincing a *private* firm or practitioner to accept a Title VII plaintiff's case. The plaintiffs have offered ample proof that they would encounter such difficulties, and that they have encountered such difficulties in the past.[20] This being the case, the plaintiffs have satisfied the second prong of Justice O'Connor's test in *Delaware Valley*. The Court shall grant the contingency enhancement that the plaintiffs have requested.

## III. CONCLUSION

For the reasons stated above, the Court holds: (1) that Roderic V.O. Boggs shall be entitled to compensation based on hourly market rates prevailing in the District of Columbia for attorneys of similar skill and experience, with similar rates charged by the law firm of Hogan & Hartson providing an appropriate benchmark; and (2) that the plaintiffs are entitled to an enhancement to the lodestar amount, to account for the risk of non-success, in the amount of 100%. The total fee to which the plaintiffs shall be entitled is $1,732,700.00. Given the Government's previous payments of $825,611.25, the amount still owing becomes $907,088.75. An Order shall issue.

---

19. The participation of private firms and practitioners is crucial, as they most often enjoy the resources and continuity of personnel to properly prosecute the action.

20. The Government also implies that a contingency enhancement for the Lawyers' Committee is not necessary because of its status as a public interest organization; according to the Government, a public interest organization receives "enhancement" in the form of market rates, and no additional enhancement is required to attract the services of such an organization. The Government cites *United States v. State of Washington*, 626 F.Supp. 1405, 1524 (W.D.Wash.1985) (non-profit attorneys not entitled to contingency enhancement because, given that they are funded through charitable contributions, they do not bear the same type of risk as private attorneys).

The Court disagrees with the cited case. It ignores the Supreme Court's consistently stated position that, for fee purposes, no distinction is to be drawn between public interest attorneys and private attorneys. *See Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989) ("That a nonprofit legal services organization may contractually have agreed not to charge *any* [emphasis in original] fee of a civil rights plaintiff does not preclude the award of a reasonable fee to a prevailing party in a § 1983 action, *calculated in the usual way.*") (emphasis added except where noted); *Blum v. Stenson,* 465 U.S. 886, 894, 104 S.Ct. 1541, 1546, 79 L.Ed. 2d 891 (1984) ("Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization.").